UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION


TIMOTHY GARDNER, SARA GUYTON, and
TRACY STURM, on behalf of themselves
and all others similarly situated                                          PLAINTIFFS


VS.                                                          CIVIL ACTION NO. 1:04cv235


NORTH MISSISSIPPI HEALTH SERVICES,
INC., NORTH MISSISSIPPI MEDICAL CENTER,
INC. and JOHN DOES 1 THROUGH 10                              DEFENDANTS


## ORDER

This cause comes before the court on the motion of defendants North Mississippi Health Services, Inc. ("NMHS") and North Mississippi Medical Center, Inc. ("NMMC") to dismiss [13-1] this action, pursuant to Fed. R. Civ. P. 12(b)(6) and 28 U.S.C. § 1367(c). The court, having considered the memoranda and submissions of the parties, concludes that the motion is well taken and should be granted.

## FACTS AND PROCEDURAL HISTORY

This action involves class action claims raised by class representatives Timothy Gardner, Sara Guyton and Tracy Sturm, on behalf of themselves and other former and future patients of NMHS hospitals. NMHS is the parent corporation of Tupelo-based NMMC and several affiliated corporations through which NMHS operates six hospitals and several other health-related entities in north Mississippi. In their complaint, plaintiffs allege that NMHS and its hospitals failed to provide them and other low-income patients with charitable care which

1

defendants were allegedly required to furnish based upon their status as tax exempt entities under 501(c)(3) of the Internal Revenue Code of 1986. Plaintiffs also allege violations of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, based upon defendants' alleged failure to provide them with legally-required emergency treatment.

This case is essentially identical to dozens of other actions filed in federal district courts nationwide against non-profit hospitals by plaintiffs similarly situated to those in the instant case. As discussed *infra*, these cases have not found a warm reception in federal court. However, this case differs from the other federal cases in that the defendants herein initially agreed to a tentative class action settlement which they submitted to this court for approval on August 6, 2004. In this tentative settlement, referred to as a "memorandum of understanding," NMHS and its provider affiliates agreed to provide either free or discounted medical care to uninsured patients with household incomes at or below specified poverty levels and to apply these discounts retroactively to class members. In addition, NMHS agreed to adopt policies against engaging in aggressive collection techniques. Finally, the parties submitted a proposed conflict of interest policy to identify and address any possible conflicts of interest among NMHS board members.

In a September 9, 2004 order, this court temporarily certified the instant action as a class action, but it declined to preliminarily approve the class action settlement at that time. Rather, the court concluded that the proposed settlement could be "significantly improved upon," and it directed the parties to modify the proposed agreement with regard to specified matters, including the adoption of more stringent conflict of interest provisions, the adoption of a more equitable

"sliding scale" for discounted care, and the adoption of reasonable geographic limitations on charitable care. Following this September 9, 2004 order, very little transpired in this case for months. Indeed, the next substantive docket entry is an April 6, 2005 motion filed by plaintiffs to enforce the aforementioned order of this court.

As was apparent from plaintiffs' motion, NMHS developed "buyer's remorse" with regard to the tentatively agreed-upon memorandum of understanding. Indeed, on April 8, 2005, NMHS filed a motion to dismiss this lawsuit in its entirety. NMHS explains that, in the wake of publicity surrounding the pending settlement, its hospitals experienced a dramatic increase in the number of indigent patients seeking charitable care, allegedly threatening its financial stability. NMHS also notes that, while it did not initially contest this court's jurisdiction, it reconsidered this position in light of numerous federal court decisions dismissing identical claims. NMHS denies that its change of heart was influenced by this court's attempts to encourage more rigorous conflicts of interest provisions for its board of directors. On May 23, 2005, this court heard oral arguments regarding plaintiffs' motion to enforce the court's prior order and regarding defendants' motion to dismiss.

## **LAW**

This court must, as always, initially determine whether it has, or should exercise, jurisdiction over this case. This is not a case in which the complaint, on its face, fails to state federal claims. To the contrary, the complaint plainly seeks relief pursuant to at least two federal statutes, and defendants did not initially dispute that the assertion of these claims gave rise to federal question jurisdiction. As discussed *infra*, however, it is apparent that neither of these alleged federal claims properly states a claim under Fed. R. Civ. P. 12(b)(6), and, absent these

3

claims, the court is left with state law claims as to which the exercise of supplemental jurisdiction would be inappropriate.

As noted previously, this case is merely one of dozens of virtually identical cases filed nationwide. As in these other cases, plaintiffs herein seek to utilize NMHS's status as a tax exempt "charitable" institution under 26 U.S.C. § 501(c)(3)[1] as a basis for inferring a privately enforceable contractual duty to provide charitable care to indigent patients. Unfortunately for plaintiffs, federal district courts have uniformly rejected the basic premise of their cause of action. Indeed, NMHS notes that over twenty federal district courts have rejected the notion that a hospital's status as a 501(c)(3) tax exempt entity gives rise to an implied contract to provide charitable care which might be enforced by private plaintiffs in a civil lawsuit.

In *Peterson v. Fairview Health Servs.,* No. Civ.A04-2973, 2005 WL 226168, at 5 (D. Minn. Feb. 1, 2005), for example, a Minnesota district court specifically held that "§ 501(c)(3) does not establish a contract between the federal government and defendants and does not provide plaintiffs with an implied cause of action or a right to sue as third-party beneficiaries."

---

[1]Section 501 exempts certain organizations from taxation, including
(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

4

In *Gary Amato, et al. v. UPMC, et al*, No. 04-1025 (W.D. Pa. Nov. 23, 2004), a Pennsylvania district court similarly held that § 501(c)(3) "contains no language indicating that Congress intended to create contract rights inuring to any citizen," and that even if such a contract were to be inferred, it would not afford the plaintiffs a right to pursue third-party breach of contract claims against the defendant hospital. Numerous other district courts have reached similar conclusions. *See, e.g. George Scott Ferguson, et al. v. Centura Health Corp.,* No. 04-1285, at 6, 4 (D. Colo. Dec. 29, 2004); *Lorens v. Catholic Health Care Partners*, No. 1:04CV1151, 2005 WL 407719, *2 (N.D. Ohio Jan. 13, 2005); *Shriner v. ProMedica Health System, Inc.*, No. 3:04 CV 7435, 2005 WL 139128 (N.D. Ohio Jan. 21, 2005); *Thomas E. Hudson v. Central Georgia Health Systems, Inc.*, No. 5:04-CV-301(DF) (M.D. Ga. Jan 13, 2005); *Katie M. Washington, et al. v. Medical Center of Central Georgia*, Inc., No. 5:04CV185(CAR) (M.D. Ga. Jan. 21, 2005).

The court finds the aforementioned authority persuasive and similarly holds that plaintiffs' § 501(c)(3) claims in the instant case fail to state claims upon which relief might be granted. The court likewise agrees with the federal courts which have concluded that nearly identical complaints to the present one failed to state claims under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd. EMTALA requires Medicare-participating hospitals to screen patients who present to the emergency room to determine if the patients are suffering from an emergency medical condition, and if such conditions exist, to stabilize the patients before they may be transferred or discharged. *See* 42 U.S.C. § 1395dd. A participating hospital "may not delay provision of appropriate medical screening examination . . . or further medical examination and treatment . . . in order to inquire about the individual's method of payment or insurance status." *See* 42 U.S.C. § 1395dd(h).

5

EMTALA does provide limited rights for civil enforcement by patients, but only with regard to patients who have suffered "personal harm as a direct result of a participating hospital's violation of a requirement of this section." The court agrees with those district courts which have held that complaints essentially identical to the instant one failed to allege "personal harm" within the meaning of § 1395dd(d)(2)(A). In *Wright et al v. St. Dominic Health Services, Inc.*, et al, No. 3:04CV521LN (S.D. Miss. March 1, 2005), for example, Judge Tom S. Lee dismissed EMTALA claims virtually identical to those herein, holding that

> [N]o plaintiff alleges that he/she suffered any "personal harm" as a result of any alleged violation of the EMTALA. Rather, the complaint simply recites that each plaintiff "sought medical care at St. Dominic," and that "[w]ithout first counseling [such plaintiff] on [his/her] financial ability to pay, St. Dominic required [him/her] by 'form contract' to agree to be responsible for [his/her] medical bills" and thereafter "pursued [him/her] with aggressive collection tactics." In the court's opinion, this does not suffice to state a claim for relief under the EMTALA. *See Peterson*, 2005 WL 226168, at 9 (dismissing EMTALA claim based on absence of allegation that plaintiffs suffered personal harm as a result of being required to sign "patient waivers" guaranteeing payment"); *Rhonda Kizzire, et al. v. Baptist Health System, Inc.*, Case No. CV-04-HS-1247-S (S.D. Ala. Oct. 21, 2004) (opining that even if plaintiffs had adequately pleaded a cause of action under the EMTALA, their alleged economic injuries were not "personal injuries" and were thus not compensable under the enforcement provisions of the EMTALA).

*Wright*, slip op. at 8-9. In the instant case, plaintiffs' complaint merely alleges that supposed EMTALA violations "have proximately caused the plaintiffs economic injury and other damages" and it is thus apparent that, as in *Wright*, plaintiffs have failed to allege "personal harm" so as to support a private action under EMTALA. The court therefore concludes that plaintiffs' EMTALA claims are due to be dismissed.

In light of the aforementioned dismissals, plaintiffs lack any viable federal claims which might give rise to federal question jurisdiction. Plaintiffs do assert various claims under state

6

law, and they argue, as did the plaintiffs in *Wright*, that this court should exercise supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367.[2] However, as noted by Judge Lee, "the general rule [is that] it is proper to decline to exercise supplemental jurisdiction over state law claims when all federal claims are dismissed or otherwise eliminated from a case prior to trial." *Wright,* slip op. at 10 (citing *Batiste v. Island Records, Inc.,* 179 F.3d 217, 227 (5th Cir. 1999)). Moreover, it is apparent that plaintiffs' remaining state law claims seek to make unprecedented use of Mississippi common law principles and statutes to impose upon non-profit hospitals broad duties to provide charitable care to indigent patients. It seems clear to this court that, if such a duty is to be imposed upon hospitals in this state based upon Mississippi law, it should be imposed by the Mississippi Supreme Court, rather than by this court. The court therefore declines to exercise supplemental jurisdiction over plaintiffs' state law claims.[3]

---

[2]Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction if a claim raises a novel or complex issue of state law, if the district court has dismissed all claims over which it has original jurisdiction, or in exceptional circumstances, there are other compelling reasons for declining jurisdiction. It appears that each of these circumstances is present in the instant case.

[3]Shortly before the hearing on the motion to dismiss, plaintiffs filed a motion to amend their complaint to allege violations of the Fair Debt Collection Practices Act, 28 U.S.C. § 3001 *et seq*. An identical amendment was sought by plaintiffs in a similar lawsuit before Judge Barbour. *See Valencia v. Mississippi Baptist Medical Center, Inc.*, 363 F. Supp. 2d 867, 873 (S.D. Miss. 2005). Judge Barbour denied the requested amendment on the basis of undue delay, and this court likewise concludes that the plaintiffs herein have unduly delayed in asserting FDCPA claims. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)(holding that leave to file an amended pleading may be denied if it is apparent that the movant engaged in undue delay). Moreover, the validity of plaintiffs' FDCPA claims is questionable, considering that the defendants in this case do not appear to be "debt collectors" within the meaning of the FDCPA. Indeed, considering the legal resources behind this massive litigation, it seems likely that, if these claims had merit, plaintiffs would have included them in their original complaint. Even if the court is to assume that these FDCPA claims have at least potential merit, there would nevertheless remain considerable doubt as to whether they would properly be litigated in a class action format.

In light of the foregoing, plaintiffs' motion to enforce this court's prior order is obviously moot. The court takes this opportunity to note, however, that, whatever the merits of their charitable care claims, plaintiffs have raised important issues regarding possible conflicts of interest among members of the NMHS board of directors. This court has declined to exercise jurisdiction over the remaining claims in this case, and it would thus be improper to evaluate the evidence presented on the conflicts issue. This court has previously noted that, as a non-profit entity not subject to the scrutiny of shareholders, it is particularly important that the NMHS board of directors be subject to meaningful and effective conflicts of interests provisions.

NMHS does appear to have made certain good faith efforts to establish procedures and safeguards which, *if actually given meaningful effect*, would reduce the potential for conflicts. Whether these safeguards are actually given meaningful effect lies primarily within the power of the NMHS board of directors, and the court hopes and expects the NMHS board to do so. NMHS has stated that, while it is a privately-owned hospital system, its true owner is the community itself. If this statement has actual meaning, it is essential that the massive financial resources at NMHS's disposal be allocated for the benefit of the community as a whole,[4] rather

---

Finally, this court has noted previously that the remaining state law claims in this case involve attempts to make unprecedented use of Mississippi state law to impose charitable care duties upon non-profit hospitals throughout this state. The court deems it important that, if such duties are to be imposed upon Mississippi hospitals, they be imposed by the Mississippi Supreme Court, rather than by this court. Thus, while plaintiffs may file individual FDCPA actions in federal court if they so choose, the court deems it improper to permit plaintiffs to, at this late date, utilize dubious FDCPA claims to retain federal jurisdiction over claims which are properly heard, if at all, in state court. The motion to amend will therefore be denied.

[4]NMHS operates one of the most lucrative non-profit hospital systems in the United States.

than for privileged members of the board of directors. NMMC has further averred in open court that it has voluntarily adopted a thirteen-point "plan of action" revising its charitable care and debt collection policies, as follows:

> 1. NMMC shall provide charity (free) care to any patient who meets its charity care guideline.
>
> 2. NMMC has set a budgetary target of 4% of gross patient revenue as charity care.
>
> 3. NMMC shall provide charity care to residents in Lee County and to its 23-county service area for services not provided in the county of the patients' residence.
>
> 4. NMMC affiliate hospitals will provide charity care to the residents of the county in which the hospital is located.
>
> 5. NMMC shall provide the prevalent managed care discount to any uninsured patient meeting the system's definition of uninsured: where the income is at 400% or less of the (Federal Poverty Level) FPL, no third party insurance coverage, an ERISA plan, Medicare, Medicaid, SCHIP, Champus, or other coverage.
>
> 6. NMMC shall post in various areas in the facility, its admission agreement form, information about the charity care policy and the assistance available.
>
> 7. NMMC shall provide information in a billing statement that NMMC provides charity care assistance for eligible patients who meet charity care guidelines.
>
> 8. NMMC will bill a patient over a period of 60 days before the patient is involuntarily referred to its in-house collection agency. Extended payment options are available.
>
> 9. Tupelo Service Finance (TSF) will not refer to an outside collection agency until several attempts have been made by TSF to collect the outstanding amount. This will not apply to any patient who has made financial arrangements with TSF and has failed to fulfill the terms of the agreement.
>
> 10. For patients who do not meet NMMC's charity care guidelines but are uninsured, NMMC will provide options to pay over a set period of time at reduced interest rates, dependent upon the financial ability and resources of the patient.
>
> 11. Neither NMMC nor TSF will place a lien on a patient's house or automobile.
>
> 12. Collection policies shall comply with the Fair Debt Collection Practice Act.[5]

---

[5] NMHS maintains that it is not a "debt collector" within the meaning of the FDCPA, but it represents that it will nevertheless voluntarily comply with the collection standards set forth in that Act, even though, according to NMHS, it is not legally required to do so.

9

13. Failing to pay medical bills shall not be reported by NMMC or TSF to a credit agency. However, if a judgment is obtained by TSF, then it shall be reported as part of public record information. If an outstanding bill is referred to an outside collection agency, the reporting to a credit agency will be determined by the policies and procedures of the outside collection agency.

While these proceedings do not establish the proper venue for litigating the issues set forth in plaintiffs' complaint, the court nevertheless notes the aforementioned information as a matter of public interest.[6]

In light of the foregoing, defendants' motion to dismiss [13-1] the federal claims against them is granted, and the court declines to exercise supplemental jurisdiction over the remaining state law claims. Plaintiffs' motion to enforce the prior order of this court [11-1] is dismissed as moot and their motion to amend [68-1] is denied.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED, this the 31st day of May, 2005.

    /s/ Michael P. Mills
**UNITED STATES DISTRICT JUDGE**

---

[6] The court also notes that, according to news reports, U.S. Senate Finance Committee Chairman Chuck Grassley has requested that NMHS and nine other hospitals and health systems provide his committee with information regarding their charitable care and billing practices, as well as their partnerships with for-profit companies. Many of the allegations set forth in plaintiffs' complaint do properly fall within the purview of the legislative, rather than judicial, branch of government, and interested citizens may wish to follow the course of any such legislative proceedings as they relate to non-profit hospitals such as NMHS.